U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY - 2 2022

CLERK, U.S. DISTRICT COURT
By_____
        Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.

No. 4:22-MJ-**314**

JOSE CORRAL SANTILLAN          (01)
a/k/a "bigcarteljoserecclezz,"
"Jose Recclezz" and
"switch_emup_recclezz"
MONTAVION JONES               (02)
a/k/a "1taywop," "Tay Wop," and
"Taywopdayuungan I got disable"
AYOOB WALI                    (03)

## CRIMINAL COMPLAINT

**Alleged Offenses:**

I, Special Agent J. Massey, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

> Between on or about March of 2022 and May of 2022, in the Fort Worth Division of the Northern District of Texas, defendants **Jose CORRAL Santillan, also known as bigcarteljoserecclezz, Jose Recclezz, and switch_emup_recclezz, Montavion JONES, also known as 1taywop, Tay Wop, and Taywopdayuungan I got disable, and Ayoob WALI,** aiding and abetting each other, did knowingly possess and transfer machineguns in violation of 18 U.S.C. §§ 2 and 922(o).

**Probable Cause:**

I, Special Agent J. Massey, affiant, under oath, duly state that I am a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), assigned to Dallas Field Division – Fort Worth Field Office. The statements set forth in this affidavit are true and correct to the best of my knowledge and belief but are not inclusive of all the evidence or information in the case.

**Criminal Complaint - Page 1**

1.     In February of 2022, I was contacted by Fort Worth Police Department

(FWPD) Officer Addy regarding what Officer Addy described as a recent surge in shootings

suspected of involving members of the Bone Crushing Gorillas criminal street gang, some of

which involved or were suspected of involving Glock switch machinegun conversion

devices. I spoke with ATF Special Agent (SA) Alexander, who stated that he interviewed

Vernon Nobles after Nobles was arrested in possession of a Glock pistol with a Glock switch

machinegun conversion device installed. Nobles claimed to have received the Glock switch

machinegun conversion device from an unidentified individual and stated that he had seen an

individual later identified as Malachi Brown, a documented BCG member, in possession of

five (5) Glock switch machinegun conversion devices. Nobles stated that he had heard from

multiple individuals that an individual, later identified as **CORRAL**, was a source for plastic

Glock switch machinegun conversion devices. FWPD Officer Addy provided me with

**CORRAL**'s Instagram as username "bigcarteljoserecclezz", and I observed that the

individual depicted in multiple photographs and videos on the account matched photographs

of **CORRAL**, including a distinctive dollar sign tattoo on his forehead. FWPD Officer Addy

confirmed to me that **CORRAL** was a documented BCG member.

2.     FWPD Officer Addy advised me that while conducting surveillance looking

for Malichi Brown, Officer Dempsey and other FWPD officers located a residence at 2916

Farrell Lane in Fort Worth, Texas. FWPD officers observed **CORRAL** and other

individuals utilizing the residence at 2916 Farrell Lane. Officer Addy stated that FWPD

officers observed Dodge Charger Scat Pack vehicles at the residence.

Officer Addy was familiar with FWPD stolen vehicle investigations which indicated that **CORRAL** and his associates were suspected of stealing this type of vehicle. I reviewed surveillance notes from February 28, 2022, conducted by Officer Addy and the FWPD Operational Surveillance Team (OST). According to these notes, officers observed **JONES**, also a documented BCG member, arrive at 2916 Farrell Lane in a silver Infinity bearing temporary tag 42185S4. Officers observed **JONES** interact with **CORRAL** and other individuals at the residence while coming and going from the residence over the course of several hours.

3.      On February 25, 2022, I was contacted by Drug Enforcement Administration (DEA) Task Force Officer (TFO) Abrahim regarding the arrest of Aaron Taylor. DEA TFO Abrahim informed me that the DEA had arrested Aaron Taylor and executed a search warrant at his residence earlier that day, where two Glock pistols with installed Glock switch machinegun conversion devices were recovered. I assisted DEA TFO Abrahim in a post-Miranda interview of Taylor. During the interview, Aaron Taylor admitted to his possession of the Glock pistols with metal Glock switch machinegun conversion devices. Aaron Taylor stated that he obtained the Glock switch machinegun conversion devices from his brother, Dmarcus Taylor. Aaron Taylor alleged that Dmarcus Taylor purchased the Glock switch machinegun conversion devices from "Jose Recclezz." Aaron Taylor claimed that Dmarcus Taylor informed him that "Jose Recclezz" had numerous Glock switch machinegun conversion devices and sold them for $100.00 each. TFO Abrahim showed Aaron Taylor a photograph of **CORRAL** obtained from the "bigcarteljoserecclezz" Instagram account, and

Aaron Taylor confirmed that this was the individual he was referencing as having sold

Dmarcus Taylor the metal Glock switch machinegun conversion devices.  DEA TFO

Abrahim further informed SA Massey that Reginald Taylor had also been arrested that same

day, and that, during a post-Miranda interview, Reginald Taylor had identified **CORRAL** as

the source of cocaine seized by DEA at a separate search warrant location.

     4.     On March 1, 2022, I provided an ATF Confidential Informant (CI) with the

Instagram profiles for username "bigcarteljoserecclezz," identified as utilized by **CORRAL**,

and username "1taywop," identified as utilized by **JONES**.  I viewed multiple photographs,

videos, and posts made to the "stories" section of these Instagram profiles and observed that

the individuals depicted as utilizing these accounts matched photographs of **JONES** and

**CORRAL**.  I also noted that **JONES** and **CORRAL** frequently posted videos or

photographs together or tagged each other in their Instagram posts.

     5.     On March 4, the CI informed me that the CI had contacted **JONES** via his

Instagram account, username "1taywop."  The CI made unrecorded video calls to **JONES**

via Instagram, during which **JONES** had confirmed that he was willing and able to sell

Glock switch machinegun devices.



(Screenshot of Instagram Communications Between CI and **JONES**)

6.      On March 6, 2022, the CI communicated via Instagram text communications

with **JONES**.  SA Massey observed that, in this text communication, the CI asked for

**JONES**' telephone number.  **JONES** then sent the CI a video, which the CI was unable to

view.  **JONES** stated, "I hy it sun pistol got gold Glocks too.  Jus lmk."  I understood this to

indicate that **JONES** was attempting to show the CI pistols which **JONES** was willing to

sell, including gold-colored Glock pistols.  The CI asked how much the pistols cost.  **JONES**

replied, "Gold ones 1800 regular 1000 ar wid fully 2500.  We can add da fully to da glizzy

go 200.  100$."  I understood this to mean that **JONES** and his associates could sell gold-colored Glock pistols for $1800 each, non-gold colored Glocks for $1000 each, fully automatic machinegun AR style rifles or pistols for $2500 each and could add a Glock switch machinegun conversion device to a Glock pistol for either $100 or $200.  Later that same day, the CI provided me with a screenshot of **JONES'** telephone number, provided by **JONES** via Instagram message.  **JONES** provided his telephone number as (682) 272-6695.



(Screenshot of Instagram Text Communications with **JONES**)



(Screenshot of Instagram Communication Depicting **JONES'** Telephone Number)

7.      On March 7, 2022, the CI informed me that the CI had spoken to **JONES** via **JONES'** cellular telephone, and that **JONES** had agreed to sell five Glock switch machinegun conversion devices at $200 each and five auto sear machinegun conversion devices at $300 each to the CI's associate the following day.

8.      On March 8, 2022, ATF SA Johnson, acting in an undercover capacity, conducted a recorded controlled purchase from **JONES** in Fort Worth.  SA Johnson contacted **JONES** via **JONES'** telephone number and identified himself as the CI's associate.  **JONES** then requested that SA Johnson FaceTime him, which SA Johnson did. When **JONES** answered the FaceTime call, SA Johnson immediately recognized the individual on the FaceTime call as **JONES**, which was based on SA Johnson's earlier review of **JONES'** state of Texas driver's license photo and multiple pictures posted on **JONES'** public Facebook page.  During the FaceTime call, **JONES** questioned SA Johnson regarding his location, which SA Johnson provided.  **JONES** then told SA Johnson that "I had to go get them real quick…I was at the spot…" and stated that he called the CI; however, that the CI did not answer.  **JONES** told SA Johnson that he was going to send SA Johnson the address for the transaction.  A short time later, SA Johnson received a text message from

**JONES** that stated, "Village creek townhomes." SA Johnson confirmed the address and stated that his GPS showed that it would take him 20 minutes to get there. SA Johnson and **JONES** exchanged additional FaceTime calls during which **JONES** provided SA Johnson with instructions for where to enter the Village Creek Townhomes and where to park. Once SA Johnson was parked, **JONES** called SA Johnson again via FaceTime and informed him that he (**JONES**) was going to have his "little partner" bring them to SA Johnson. SA Johnson then observed an unidentified juvenile (UJ 1) walking from parking lot one over from where SA Johnson was parked. **JONES** instructed SA Johnson to stay on the phone with him. As UJ 1 got close, SA Johnson motioned for him to enter the front passenger seat. **JONES** also instructed SA Johnson to "tell him to get in." **JONES** remained on the FaceTime call during the entirety of the transaction. UJ 1 then entered the front passenger seat and left the door open. **JONES** told UJ 1 that he could "go ahead and give it to him." **JONES** then told SA Johnson that he could give UJ 1 the money first. SA Johnson then proceeded to count out $2,500 in prerecorded ATF Agent Cashier funds, which was the price agreed upon by **JONES** and the CI. SA Johnson asked **JONES** if the price was "25" and **JONES** replied in the affirmative and stated "2,500." SA Johnson then handed the $2,500 to UJ 1. UJ 1 retrieved a clear, plastic bag from his right jacket pocket and handed it to SA Johnson. SA Johnson could see several plastic devices inside the bag. SA Johnson then inspected the bag and asked **JONES**, "so the red ones are the ones that go in the Glocks and make it go all the way bang?" **JONES** replied, "yeah, yeah, yeah" and stated that the weird looking ones go in the "Ars." SA Johnson stated he was not familiar with ARs and asked

**JONES** that when you put the sear in the AR, it "makes it full all the way?" **JONES**
replied, "Yeah, fully, like if you touch it, it will go fully." SA Johnson then counted the
devices and confirmed that he had five of the ones for the "AR fully's" and **JONES**
interjected that there are five of the "pistol ones." SA Johnson and **JONES** discussed future
purchases of Glock switch and auto sear machinegun conversion devices, as well as firearms
that **JONES** offered to sell. UJ 1 exited the vehicle and walked back in the direction he
came from. SA Johnson departed the location and deactivated his recording equipment.



(Photograph of Glock Switch and Auto Sear Machinegun Conversion Devices Purchased)

9.      Prior to the above controlled purchase, ATF TFO St. Clair established
surveillance at 2916 Farrell Lane. TFO St. Clair observed **JONES'** vehicle arrive at the
location at approximately 1640 hours. FWPD Officer Bounds monitored a surveillance
camera in the area, and witnessed **JONES** depart his vehicle and meet with **CORRAL** and
another individual in the front yard of the residence. Officer Bounds observed **JONES** re-
enter his vehicle and depart 2916 Farrell Lane, while **CORRAL** and the other individual
entered the residence. After a few minutes, Officer Bounds observed **CORRAL** and two

other individuals exit the residence and depart in separate vehicles. At approximately 1754 hours, Officer Bounds witnessed **JONES** return to 2916 Farrell Lane, enter the residence, then quickly exit the residence and depart in his vehicle. At approximately 1802 hours, Officer Bounds utilized a stationary video camera to locate **JONES'** vehicle, containing two occupants, in a parking lot of the Village Creek Town Homes. At approximately 1805 hours, SA Johnson contacted UJ 1. Immediately following the completion of the controlled purchase, Officer Bounds observed UJ 1 return to **JONES'** vehicle. A short time later, Officer Bounds observed the two vehicles in which **CORRAL** and his associates departed return to 2916 Farrell Lane. ATF TFO Fangman observed **JONES** and UJ 1 drive to the Tuscany Apartments, exit **JONES'** vehicle, and enter an unidentified apartment.



(UJ 1 Returning to **JONES'** Vehicle After the Controlled Purchase)

10.     On March 15, 2022, SA Johnson initiated a FaceTime call to **JONES** at telephone number 682-272-6695. SA Johnson began the call by asking **JONES** what he would have to sell on Thursday, March 17, 2022. **JONES** stated that he was unsure if "we" still have "the Beretta" and would check and stated he knew for sure they had "some

switches" for SA Johnson to purchase. SA Johnson informed **JONES** that he would like to purchase 10 Glock switches and would purchase a firearm that already was outfitted with a switch or a firearm that a switch would fit on. SA Johnson asked **JONES** about a switch that had a toggle feature and **JONES** said that those cost "way more." **JONES** further stated that their source of supply (SOS) for those came over the previous day. SA Johnson and **JONES** engaged in negotiations over what type of Glock switch machinegun conversion devices and firearms **JONES** would be able and willing to sell to SA Johnson. **JONES** indicated he would have to check with his "boss" about pricing.

11.     On March 16, 2022, SA Johnson initiated a FaceTime video call with **JONES** via **JONES'** telephone number. **JONES** indicated that he was ready to sell Glock switch machinegun conversion devices and described the process by which they were installed.

12.     On March 17, 2022, SA Johnson, acting in an undercover capacity, conducted a recorded controlled purchase of 10 plastic Glock switch machinegun conversion devices and one Glock pistol with a metal Glock switch machinegun conversion device installed from **JONES** in Fort Worth, Texas.   Prior to the controlled purchase, SA Johnson and **JONES** exchanged FaceTime video calls via **JONES'** cellular telephone in which they discussed pricing and negotiated over the sale of the items. **JONES** showed SA Johnson his Glock with metal Glock switch machinegun conversion device and explained how to use the toggle switch to choose fully or semiautomatic function of the pistol. While traveling to meet with **JONES**, SA Johnson received another FaceTime call from **JONES**, during which **JONES** indicated that UJ 1 was unavailable, and **JONES** would be having a different

Criminal Complaint - Page 11

individual deliver the Glock switch machinegun conversion devices to SA Johnson.  SA

Johnson activated audio and video recording devices and parked in the same parking lot as

the prior controlled purchase at the Village Creek Town Homes in Fort Worth, Texas.  An

unidentified black male (UM 1) approached SA Johnson's vehicle.  **JONES** engaged in

several FaceTime video calls with SA Johnson and remained on the video call throughout the

transaction.  UM 1 opened a backpack and provided SA Johnson with a plastic bag

containing the Glock pistol and Glock switch machinegun conversion devices.  SA Johnson

displayed the Glock pistol for **JONES** to view via FaceTime, and **JONES** explained which

side the toggle switch needed to be on for the pistol to be "full" or "fully."  **JONES** and SA

Johnson continued discussing firearms prices.  SA Johnson provided UM 1 with $5,200 in

U.S. currency.  UM 1 exited SA Johnson's vehicle and walked away.  After SA Johnson

departed the area, **JONES** continued to contact SA Johnson via FaceTime to discuss further

firearms sales, inquire about whether SA Johnson or the CI would be willing to purchase

high end vehicles, and discuss what types of narcotics the CI could sell to **JONES**.



(**JONES** on FaceTime During the Controlled Purchase)

Criminal Complaint - Page 12

13.     After the above controlled purchase was concluded, ATF and FWPD surveillance units followed **JONES** from the Village Creek Town Homes to 2916 Farrell Lane, where **JONES** met with **CORRAL** in the front yard of the residence at approximately 1528 hours.  At approximately 1541 hours, **JONES** retrieved a bag from his vehicle, then entered **CORRAL**'s vehicle with **CORRAL** and an unidentified individual.  Surveillance units followed **CORRAL** and **JONES** to a gas station, then to a residence located at 4337 Martin Street in Fort Worth, where an unidentified female approached **CORRAL**'s vehicle on the street and appeared to be handed an unknown item before returning inside the residence.  **CORRAL** and **JONES** then returned to 2916 Farrell Lane.

14.     On April 1, 2022, the CI contacted **CORRAL** via **CORRAL**'s Instagram, username "bigcarteljoserecclezz."  **CORRAL** provided the CI with his telephone number, (817) 893-4810.  The CI placed a recorded FaceTime video call to **CORRAL** via **CORRAL**'s telephone number.  The CI and **CORRAL** discussed that **JONES** had been arrested after a traffic stop the previous night.  **CORRAL** acknowledged that **JONES** had informed **CORRAL** of the CI and the CI's desire to meet with **CORRAL**.  **CORRAL** stated that **JONES** had "come here and grab them things from me and take them over there," which I understood to be a reference to **CORRAL**'s role in providing the Glock switch and auto sear machinegun conversion devices previously purchased from **JONES**.  The CI explained to **CORRAL** that he lived near the Mexican border and wished to acquire firearms and Glock switch machinegun conversion devices.  The CI stated that he was involved in an operation that moved items across the border.  **CORRAL** and the CI discussed future pricing

Criminal Complaint - Page 13

for Glock switch machinegun conversion devices, and **CORRAL** assured the CI that he

would sell them for $80 each. The CI offered to pay in cash or trade for future purchases.

**CORRAL** asked if the CI had "the white," which I understood to be a reference to cocaine.

The CI responded in the affirmative, and **CORRAL** asked how much a "brick" cost, which I

understood to be a reference to a kilogram of cocaine. **CORRAL** expressed interest in

obtaining cocaine from the CI in the future.

15.     On April 5, 2022, SA Johnson and the CI met with **CORRAL** and conducted a

controlled purchase of eight auto sear machinegun conversion devices and one Zastava pistol

from **CORRAL** in Fort Worth, Texas. This controlled purchase was audio and video

recorded. Prior to the controlled purchase, I searched the CI's person for contraband with

negative results. SA Johnson and the CI traveled to the parking lot of a Hooter's restaurant

in Arlington, Texas to meet **CORRAL**. The CI contacted **CORRAL** via **CORRAL**'s

telephone throughout this controlled purchase. Prior to the controlled purchase, surveillance

units located **CORRAL**'s vehicle at 2916 Farrell Lane and observed **CORRAL** and another

individual, later identified as Kambryn Dukes, a BCG member, depart the residence in

**CORRAL**'s vehicle. The surveillance units followed **CORRAL**'s vehicle until it arrived at

the Hooter's restaurant parking lot. **CORRAL** exited his vehicle and contacted SA Johnson

and the CI in SA Johnson's vehicle. SA Johnson, the CI, and **CORRAL** discussed the

previous controlled purchases from **JONES**, and **CORRAL** expressed frustration that

**JONES** had raised the price of the machinegun conversion devices and used juveniles to

deliver them instead of doing it himself. **CORRAL** acknowledged that he had provided the

Glock switch machinegun conversion devices to **JONES** to be sold to SA Johnson and had

instructed **JONES** to bring **CORRAL** the money.  **CORRAL** stated that he would sell

Glock switch machinegun conversion devices to SA Johnson and the CI for $100 each, or

$80 each if they purchased 30 or more at one time.  SA Johnson asked to purchase 10 Glock

switch machinegun conversion devices right now, and **CORRAL** agreed to make a call to

acquire them, referencing that the individual who had them was in Arlington, Texas.

**CORRAL** attempted to place two telephone calls to the source of supply, but they went

unanswered.  SA Johnson observed the screen of **CORRAL**'s cellular telephone while

**CORRAL** was attempting these calls and saw that the contact for the supplier was listed as

"Wale."  **CORRAL** then indicated that he would call another individual to see how many

auto sear machinegun conversion devices he had on hand.  **CORRAL** spoke with an

unidentified individual and asked, "How many AR switches."  The unidentified individual

stated, "you got ocho."  **CORRAL** agreed to lead SA Johnson and the CI to the location to

purchase the auto sear machinegun conversion devices.  **CORRAL** sent the CI a text

message communicating the address they were to travel to, which was located at 4200

Carmel Avenue, Fort Worth, Texas.  SA Johnson asked **CORRAL** if **CORRAL** had the 3D

printer to manufacture the machinegun conversion devices.  **CORRAL** answered that he did

not, but said, "I got the guy that got the printer."  **CORRAL** stated that his associate could

make 350 machinegun conversion devices in a day.  **CORRAL** showed SA Johnson

photographs of large volumes of machinegun conversion devices on **CORRAL**'s cellular

telephone.  The CI asked **CORRAL** what kind of narcotics **CORRAL** sold.  **CORRAL**

responded that he sells "bowls and coke", which I recognized as a reference to marijuana and cocaine. The CI reminded **CORRAL** that the CI could sell kilograms of cocaine for $20,000, and **CORRAL** responded, "that's a good ass number."

16.     Surveillance units followed **CORRAL**, Dukes, SA Johnson, and the CI to 4200 Carmel Avenue. **CORRAL** entered the residence at 4200 Carmel Avenue, then exited with a black male he referred to as "Terry." **CORRAL** was holding a clear plastic bag containing the auto sear machinegun conversion devices. SA Johnson observed several other individuals in the front yard of 4200 Carmel Avenue, including **Dmarcus TAYLOR**. **CORRAL** counted the auto sear machinegun conversion devices and confirmed there were eight (8). The CI asked **CORRAL** if he had any firearms for sale, and **CORRAL** returned inside the house to retrieve a Zastava pistol. **CORRAL** made comments indicating that he had already sold other firearms. SA Johnson provided **CORRAL** with $2,500 in U.S. currency in exchange for the pistol and auto sear machinegun conversion devices. SA Johnson and the CI then departed 4200 Carmel Avenue.



(Photographs of **CORRAL** with Zastava Pistol at 4200 Carmel Avenue)

17.     Later that same day, the CI returned to 4200 Carmel Avenue.  The CI informed me that he/she observed several individuals possessing firearms within the residence, along with approximately nine ounces of what the CI recognized as cocaine in the living room of 4200 Carmel Avenue.

18.     On April 7, 2022, **CORRAL** contacted the CI via FaceTime video call from **CORRAL**'s telephone number.  **CORRAL** showed the CI a box containing numerous Glock switch and auto sear machinegun conversion devices.  **CORRAL** informed the CI that he "just got, like 55."  **CORRAL** explained that he would sell the machinegun conversion devices for $80 each.  The CI explained that he/she was not in town and would contact **CORRAL** when the CI returned to the area.



(Screenshot of CI 2302 Video Call with **CORRAL**)

Criminal Complaint - Page 17

19.     On April 8, 2022, DEA SA Finney provided me with subscriber information and telephone toll records for **CORRAL**'s telephone, assigned telephone number (817) 893-4810. I examined the telephone toll records, and observed that, on April 5, 2022, at approximately 1635 hours, **CORRAL** placed two outgoing, unanswered calls to telephone number (520) 360-1754, which corresponded to the two telephone calls SA Johnson observed **CORRAL** attempt to place to "Wale," who **CORRAL** described as the source for Glock switch machinegun conversion devices.

20.     DEA SA Finney provided me with subscriber information and telephone toll records for telephone number (520) 360-1754. I observed that this telephone number had past contact with both **CORRAL** and **JONES**. I noted that the subscriber information for the telephone number listed the following information:

    a.    Financial Liable Party: Kervan Rajab – 408 Juniper Drive, Arlington, TX 76018 – kervanrajab@gmail.com

    b.    Billing Party: Kervan Rajab – 408 Juniper Drive, Arlington, TX 76018

    c.    User Information: Wali Wali – 408 Juniper Drive, Arlington, TX 76018 – kervanrajab@gmail.com – IMSI: 310280013680477

21.     I conducted a search of law enforcement and open-source databases for Kervan Rajab and 408 Juniper Drive, Arlington, Texas. I noted that Kervan Rajab was also associated with the address of 8111 Zephyr Court, Arlington, Texas. ATF TFO Cline provided me with a list of individuals associated with the 408 Juniper Drive address in the Arlington Police Department's internal reporting system. I observed that one of the individuals was Ayoob **WALI**, who's driver's license also listed 8111 Zephyr Court,

Arlington, Texas as **WALI**'s home address.  I conducted a search of **CORRAL**'s Instagram, username "bigcarteljoserecclezz," for individuals who utilized the terms "Wali" or "Wale" in their username.  I identified one such individual, username "wale_east."  I noted that "wale_east" listed the words "Kurd" and "Anti-Social" in their Instagram profile.  I located a Facebook profile for "Kervan Rajab (Karwan)" and observed that the profile picture appeared to match Kervan Rajab's driver's license photograph.  I further noted that the Facebook profile featured the word "ANTISOCIAL."  I located an Instagram profile for Kervan Rajab under username "karwan_not_here."  I observed that this Instagram profile featured the word "Kurdish" in the description.

22.     On April 16, 2022, **CORRAL** communicated with the CI via **CORRAL**'s telephone.  The CI informed **CORRAL** that the CI would travel to Fort Worth, Texas, on April 18, 2022, and wished to purchase 30 Glock switch machinegun conversion devices from **CORRAL**.  **CORRAL** asked if the CI wanted any specific type.  The CI explained that the CI was selling the machinegun conversion devices to an individual in Mexico.  The CI told **CORRAL** that the CI expected to be receiving "Jale" the next week.  I recognized "Jale" as a Spanish slang term which can translate to "work" and is normally used in this context as a term for narcotics.  **CORRAL** stated that he was trying to "get a whole thing."  I understood **CORRAL** to mean that he wished to acquire a full kilogram of cocaine, based on the context and previous conversations between the CI and **CORRAL**.  The CI offered to meet with **CORRAL** on April 18, 2022, to discuss a trade.  **CORRAL** responded, "Yeah, we can. Hell yeah."

Criminal Complaint - Page 19

23.     On April 18, 2022, SA Johnson and the CI participated in a controlled purchase of 17 Glock switch machinegun conversion devices, 39 auto sear machinegun conversion devices, and one Anderson Manufacturing pistol with an installed auto sear machinegun conversion device from **CORRAL**, Dmarcus TAYLOR, and **WALI** at 4200 Carmel Avenue in Fort Worth, Texas.  Prior to conducting the controlled purchase, SA Johnson and SA Sutton search the CI's person for contraband with negative results.  This controlled purchase was audio and video recorded.  At approximately 1917 hours, SA Johnson and the CI arrived at 4200 Carmel Avenue and waited for **CORRAL** to arrive.  SA Johnson observed other vehicles and individuals were present while they waited.  SA Johnson then saw **CORRAL** and Decorian Titus arrive in **CORRAL**'s vehicle.  SA Johnson and the CI contacted **CORRAL** and Titus and followed them into the residence at 4200 Carmel Avenue.  Inside, SA Johnson observed two unidentified individuals playing video games in the living area and a black AR style pistol propped on the couch next to a black handgun.  **CORRAL** showed SA Johnson a box on the couch, which contained two Glock switch machinegun conversion devices and 14 auto sear machinegun conversion devices. **CORRAL** stated that he could have 40 more machinegun conversion devices delivered, but they were not at the residence.  SA Johnson took possession of the box of machinegun conversion devices and walked outside of the residence with the CI and **CORRAL**.



(Interior of 4200 Carmel Avenue with AR Pistol Propped on Couch)

24.     Once outside, SA Johnson noticed that the box containing the machinegun conversion devices was marked Inland Professional Series, 3D Printing Filament.  I know that this is the type of plastic filament that is used in a 3D printer to create 3D objects.



(3D Printer Filament Box Containing Machinegun Conversion Devices)

25.     The CI and **CORRAL** discussed **CORRAL**'s desire to exchange money, firearms, and machinegun conversion devices for kilograms of cocaine.  The CI stated that the CI would pay **CORRAL** and his associates to show the CI the 3D printer and explain how it worked.  **CORRAL** indicated that his associate who had the 3D printer was

Criminal Complaint - Page 21

"Muslim," and that the individual was paranoid, but that **CORRAL** had been to the location of the 3D printer and could get his associate to send a video of the printer's operation. **CORRAL** indicated that the individual who would be delivering the 40 machinegun conversion devices was not the same individual who was printing them but was coming from **CORRAL**'s "other spot." **CORRAL** claimed that his "brother" was going to bring the additional machinegun conversion devices from **CORRAL**'s mother's house. The CI attempted to clarify and ask if the CI and SA Johnson could meet the individual who made the machinegun conversion devices. **CORRAL** stated that he would have to call the individual because the person was paranoid. SA Johnson observed as Dmarcus TAYLOR and an unidentified male exited a black GMC Yukon that had arrived at 4200 Carmel Avenue.

26.    **CORRAL** stated that he had spoken to the source of supply for the machinegun conversion devices about meeting with SA Johnson and the CI, but the source of supply stated that they preferred for SA Johnson and the CI to continue purchasing from **CORRAL**. **CORRAL** and the CI continued discussing that **CORRAL** could provide a combination of currency, firearms, and machinegun conversion devices in exchange for a kilogram of cocaine worth $20,000. **CORRAL** replied, "Hell yeah." **CORRAL** offered to sell another "Draco" (Zastava) pistol to SA Johnson. SA Johnson asked about the AR pistol on the couch in the residence. **CORRAL** stated it belonged to his "brother" and had an auto sear machinegun conversion device installed in it. **CORRAL** showed SA Johnson and the

CI a photograph of a "Draco" firearm on his cellular telephone and indicated it was the one he just acquired.



(**CORRAL** Showing a Photograph of a Pistol on his Cellular Telephone)

27.     **CORRAL** offered to go inside the residence to determine how much the individual who owned the AR pistol on the couch would sell it for.  As **CORRAL** approached the residence, he called out to "Lil D," which SA Johnson recognized as the name **CORRAL** used for **Dmarcus TAYLOR**.  **CORRAL** exited 4200 Carmel Avenue and informed SA Johnson that his associate wanted $1500 for the AR pistol.  **CORRAL** confirmed that the AR pistol contained a plastic auto sear machinegun conversion device. SA Johnson agreed to purchase the pistol for $1500.  **CORRAL** entered the residence at 4200 Carmel Avenue and returned with the AR pistol.  **CORRAL** provided the AR pistol to SA Johnson in exchange for $1500 in U.S. currency.  **CORRAL** walked back to the front of the residence, where Dmarcus TAYLOR was just exiting, and handed Dmarcus TAYLOR an amount of currency.  **CORRAL** and Dmarcus TAYLOR returned to SA Johnson, and TAYLOR stated, "That is my favorite AR in the world."

Criminal Complaint - Page 23



(**CORRAL** and Dmarcus TAYLOR with CURRENCY)

28.     Dmarcus TAYLOR explained that he had the AR pistol for "damn near a year." SA Johnson asked if the plastic auto sear machinegun conversion device in the AR pistol would last. **CORRAL** stated, "Hell yeah", and Dmarcus TAYLOR added, "He put it in for me." SA Johnson asked Dmarcus TAYLOR if "that thing goes all the way bang" and if it takes about two seconds to fire all the rounds in the magazine. Dmarcus TAYLOR nodded his head in the affirmative to each of these questions and stated, "30 round mag." **CORRAL** and Dmarcus TAYLOR then reentered 4200 Carmel Avenue.

29.     **CORRAL** exited the residence while speaking with someone on the telephone. **CORRAL** told the individual that **CORRAL** sent his location and admonished the person that "you've been here a million times." **CORRAL** confirmed to SA Johnson that his "brother" would be there to deliver the additional 40 machinegun conversion devices in approximately 15 minutes. Dmarcus TAYLOR exited the residence and asked **CORRAL** if he would install a "switch" in a firearm Dmarcus TAYLOR might purchase from an unidentified individual. **CORRAL** confirmed he would. Dmarcus TAYLOR made a

statement indicating he was distraught over having sold "my ARP." **CORRAL** continued to engage in discussion about firearms with SA Johnson. **CORRAL** explained that a Glock switch machinegun conversion device would fit on any Glock pistol that did not have a single-stack magazine. Dmarcus **TAYLOR** returned to the area where they were standing and stated, "I loved that AR, that's crazy."

30.    SA Johnson asked **CORRAL** how many machinegun conversion devices his source of supply could make by Thursday. **CORRAL** stated he would have to ask. **CORRAL** confirmed that they could be made in different colors and with logos on them. **CORRAL** confirmed that his source of supply had a computer and a machine and described the 3D printer as "it ain't that big." **CORRAL** stated he believed his source of supply acquired the printer "on a lick type shit". I recognized this terminology as reference to proceeds of a robbery or burglary. **CORRAL** said the source of supply stated the hardest part was getting the specific design for the machinegun conversion devices.

31.    SA Johnson observed a white Lexus sedan arrive at 4200 Carmel Avenue, driven by **WALI** with an unidentified front passenger. I recognized this white Lexus as having been in photographs on Kervan Rajab's Facebook and Instagram pages. **WALI** exited the vehicle and opened the trunk. **CORRAL** met **WALI** at the trunk. **WALI** closed the trunk and continued to speak with **CORRAL**. **WALI** reentered the driver's seat and departed the area.



(White Lexus and Ayoob **WALI**)

32.     As **CORRAL** returned from the rear of the white Lexus, SA Johnson observed a bulge in his hooded sweatshirt pocket, from which the corner of a plastic bag was protruding.  SA Johnson noted that this bulge and plastic bag had not been present during the rest of the controlled purchase and was obvious due to the fit of the hooded sweatshirt. **CORRAL** walked to SA Johnson and pulled the plastic bag out of his pocket.  SA Johnson observed that the bag contained both Glock switch and auto sear machinegun conversion devices.  **CORRAL** remarked to Dmarcus TAYLOR that these machinegun conversion devices had been hidden in the grill at his mother's house.  The CI asked **CORRAL** to call his source of supply to see how many machinegun conversion devices they had.  **CORRAL** complied, placed a telephone call and asked the individual, "How many legos available?" **CORRAL** told the CI, "70 Glock, 50 ARs."  **CORRAL** then asked the individual how many the machine made in one day.  **CORRAL** appeared to repeat the answer out loud, "100 in 72 hours?"  SA Johnson confirmed that the plastic bag contained 40 machinegun conversion devices and confirmed with **CORRAL** that the total price for 56 machinegun conversion

devices was $4,480.  SA Johnson placed the machinegun conversion devices in his vehicle and provided **CORRAL** with U.S. currency.  SA Johnson witnessed Dmarcus TAYLOR purchase a Glock pistol from an unidentified black male.  SA Johnson and the CI and **CORRAL** engaged in another discussion regarding **CORRAL**'s desire to trade 250 machinegun conversion devices for a kilogram of cocaine.  SA Johnson and the CI departed the area of 4200 Carmel Avenue.



(Machinegun Conversion Devices, AR Pistol, and Filament Box)

33.     When the white Lexus sedan, driven by **WALI**, departed 4200 Carmel Avenue, ATF and FWPD OST units conducted mobile surveillance.  The white Lexus sedan, registered to Kervan Rajab, traveled to the Forest Hill Indoor Market, where **WALI** exited the vehicle and entered the market for approximately 10 minutes.  **WALI** then traveled to a residence in Arlington, Texas, before continuing on to 8111 Zephyr Court, Arlington, Texas.  On April 15, 2022, ATF SA Peters obtained a search warrant for real time location data for **WALI**'s cellular telephone, associated with telephone number (520) 360-1754, and **CORRAL**'s cellular telephone, associated with telephone number (817) 893-4810.  I

Criminal Complaint - Page 27

monitored **WALI**'s location during this controlled purchase and noted that **WALI** traveled from an area just north of Burleson, Texas to 4200 Carmel Avenue, then followed a route consistent with that observed by the surveillance units until becoming stationary in the area of 8111 Zephyr Court and remaining there until late the next day.

34.     Upon conclusion of the controlled purchase, ATF SA Sutton and I observed photographs posted to the story section of Dmarcus TAYLOR's Instagram account, username "deekasino2x," which depicted an AR pistol, which matched the one purchased by SA Johnson, for sale, as well as a hand holding currency consistent with that provided to **CORRAL** by SA Johnson.



(Screenshots from Dmarcus TAYLOR's Instagram)

35.    Upon completion of this controlled purchase, ATF SA Sutton examined the Anderson Manufacturing pistol purchased from **CORRAL** and Dmarcus TAYLOR and located a black plastic auto sear machinegun conversion device within the pistol. SA Sutton conducted a field function check of the Anderson Manufacturing pistol and observed that it functioned tested as a machinegun with the auto sear machinegun conversion device installed.



(Interior of Anderson Manufacturing Pistol with Auto Sear and Removed Auto Sear)

36.    On April 25, 2022, DEA SA Finney provided me with updated telephone toll records for **CORRAL's** cellular telephone. I reviewed the updated toll records, and observed that, on April 18, 2022, at approximately 1959 hours, CORRAL's telephone records showed an outgoing call to telephone number (520) 360-1754, believed to be the telephone utilized by **WALI**. The toll records showed that this telephone call lasted approximately 98 seconds and was part of a consecutive series of telephone calls between **CORRAL** and **WALI**. SA Massey noted that this telephone call at 1959 hours coincided

with the telephone call SA Johnson and CI 2302 witnessed **CORRAL** make to the individual **CORRAL** described as the person using a 3D printer to manufacture Glock switch and auto sear machinegun conversion devices.

37.     On April 21, 2022, **CORRAL** sent a series of photographs and videos to the CI via **CORRAL**'s Instagram profile, username "bigcarteljoserecclezz." I reviewed the images and videos from **CORRAL**. I observed that the first photograph in the sequence depicted a computer screen showing an image of an unidentified "slicer" program. I was familiar with some 3D printing technology and knew that a "slicer" is a software program which turns a 3D design into a list of commands for a 3D printer to carry out. I recognized the image depicted in the "slicer" program as one of numerous 3D shapes consistent with Glock switch machinegun conversion devices. I understood that this "slicer" program image could create the instructions for a 3D printer to print the number of Glock switch machinegun conversion devices depicted on the screen. I observed that the bottom of the computer screen showed an estimated print time of 1 day, 18 hours, and 43 minutes.



38.    I observed that the second photograph in the sequence depicted a computer screen showing a different image of an unidentified "slicer" program.  I noted that the second photograph depicted numerous 3D images consistent with the shape of auto sear machinegun conversion devices.  I understood that this "slicer" program image could create the instructions for a 3D printer to print the number of auto sear machinegun conversion devices depicted on the screen.  I observed that the bottom of the computer screen showed an estimated print time of 1 day, 20 hours, and 4 minutes.



39.     I observed that the third file in the sequence was a video of a functioning 3D

printer.  I noted that the 3D printer was extruding bright yellow plastic filament in a curved

x-shape outline with a solid circle in the middle and a square in the top left corner.  The

video showed the 3D printer as it printed a layer of filament in the shape of a square with a

hole in the middle in the top right corner of the curved x-shape.  I recognized this 3D printer

sequence as appearing to be consistent with a bed leveling test.  I knew that individuals using

3D printers sometimes print this type of design to test whether the surface on which the

plastic print is being made is properly leveled, to avoid problems with printing 3D objects

with the printer.

Criminal Complaint - Page 32



40.     On April 22, 2022, at approximately 1739 hours, I was communicating with the CI via telephone when the CI received an incoming video call from **CORRAL** via his Instagram profile, username "bigcarteljoserecclezz." The CI informed me that, during this video call, **CORRAL** indicated he would soon be traveling to pick up 500 machinegun conversion devices he intended to trade the CI for two kilograms of cocaine. I monitored the real time location data for **CORRAL**'s cellular telephone and observed that, shortly after the video call to the CI, **CORRAL**'s telephone was in the area of 2916 Farrell Lane, Fort Worth, Texas. **CORRAL**'s telephone remained in that area until approximately 1603 hours.



41. At approximately 1618 hours, I observed that **CORRAL**'s telephone had changed locations to an area which included the residence at 4200 Carmel Avenue, Fort Worth, Texas. I observed that **CORRAL**'s telephone remained in the area of 4200 Carmel Avenue until the morning of April 23, 2022, aside from a singular change to an area approximately 1.7 miles west at approximately 1918 hours.



42.     I also monitored the location of **WALI**'s cellular telephone.  I observed that, at approximately 1751 hours, after **CORRAL**'s telephone call to the CI, **WALI**'s telephone was present in an area which included 8111 Zephyr Court, Arlington, Texas.  **WALI**'s telephone remained in this area until approximately 1852 hours.



43.    At approximately 1852 hours, **WALI**'s telephone changed locations to an area just north of 8111 Zephyr Court.



44.    At approximately 1907 hours, **WALI**'s telephone returned to the area of 8111

Zephyr Court and remained there until at least 1952 hours.  At approximately 2007 hours,

**WALI**'s telephone moved to an area in Arlington, Texas.



45.    At approximately 2022 hours, **WALI**'s telephone returned to the area of

Zephyr Court and remained there until at least 2123 hours.  At approximately 2138 hours,

**WALI**'s telephone changed locations to an area just west of 8111 Zephyr Court.  I noted that

this area was on a route which an individual would likely take to travel from 8111 Zephyr

Court to 4200 Carmel Avenue.  I mapped the route between the two residences and observed

an approximate travel time of 22 minutes.



46.    At approximately 2153 hours, **WALI**'s telephone was in an area which

included the residence at 4200 Carmel Avenue, the same area as **CORRAL**'s telephone.



47.    At approximately 2208 hours, **WALI**'s telephone changed locations to an area just southeast of 4200 Carmel Avenue.  I noted that this location was consistent with the route an individual would likely take to travel back from 4200 Carmel Avenue to 8111 Zephyr Court.



48.    At approximately 2223 hours, **WALI**'s telephone returned to an area just southeast of 8111 Zephyr Court, consistent with the route of travel from 4200 Carmel Avenue to Zephyr Court.



49.     At approximately 2239 hours, **WALI**'s telephone returned to the area of 8111 Zephyr Court, Arlington, Texas.  I observed that the above movements of **WALI**'s telephone were consistent in terms of direction, location, and timing, with the route an individual might take to travel from 8111 Zephyr Court to 4200 Carmel Avenue and back.

50.     The CI provided me with photographs and videos sent by **CORRAL** via his Instagram account, username "bigcarteljoserecclezz."  At approximately 2208 hours, the same time as **WALI**'s telephone was in an area consistent with having just departed 4200 Carmel Avenue, **CORRAL** sent a photograph depicting a box containing four plastic bags, two of which I recognized as containing numerous 3D printed plastic auto sear machinegun conversion devices in blue, orange, and black plastic, and two of which I recognized as containing numerous 3D printed plastic Glock switch machinegun conversion devices in

yellow and black plastic.  I noted that the yellow plastic was similar in color to the yellow plastic depicted in the 3D printer video provided by **CORRAL** on April 21, 2022.



51.   At approximately 2218 hours, **CORRAL** attempted to video chat with the CI via his Instagram account, but the CI did not answer.  At approximately 2240 hours, **CORRAL** sent a photograph depicting two large vacuum sealed bags containing numerous 3D printed Glock switch and auto sear machinegun conversion devices.



52.    At approximately 2243 hours, **CORRAL** sent the CI a video via his Instagram

account.  I observed that the video depicted a hand holding what appeared to be a large,

opaque, vacuum sealed bag.  I recognized that the shapes visible through the contours of the

bag could be consistent with a bag containing numerous small, hard items.  I believed, based

on context, that **CORRAL** intended to show the bag contained additional Glock switch

and/or auto sear machinegun conversion devices.



53.     On April 4, 2022, Firearms Enforcement Officer (FEO) Eisenbise examined

the 15 Glock switch machinegun conversion devices, five auto sear machinegun conversion

devices, and Glock pistol with an installed Glock switch machinegun conversion device, all

of which were purchased from **JONES** during the first two controlled purchases, and which

**CORRAL** admitted to providing to **JONES**.  FEO Eisenbise conducted test fires of the

Glock pistol, as well as a one exemplar of the Glock switch machinegun conversion devices

and two exemplars of the auto sear machinegun conversion devices.  FEO Eisenbise

observed that each of the tested devices allowed a firearm to expel more than one projectile

per depression of the trigger.  FEO Eisenbise observed that each of the untested machinegun

conversion devices were identical in size, shape, dimension, design, and material to those

which were test fired.  FEO Eisenbise determined that each of the devices and the firearm

purchased from **JONES** met the definition of "machinegun" under 26 U.S.C § 5845(b) and

also met the definition of "firearm" under 26 U.S.C § 5845(a)(6).  FEO Eisenbise further

determined that each of the devices and the firearm purchased from **JONES** met the

definition of a "machinegun" in accordance with the reference in the Gun Control Act, 18

U.S.C. 921(a)(23), which specifically relies on the meaning given this term under the

National Firearms Act.

    54.     Based upon the above facts and circumstances, I respectfully submit that there

is probable cause to believe that **Jose CORRAL Santillan, also known as**

**bigcarteljoserecclezz, Jose Recclezz, and switch_emup_recclezz, Montavion JONES,**

**also known as 1taywop, Tay Wop, and Taywopdayuungan I got disable, and Ayoob**

**WALI,** have committed violations of federal law by aiding and abetting each other in the

possession and transfer of machineguns in violation of 18 U.S.C. §§ 2 and 922(o).

 

Special Agent J. Massey
Bureau of Alcohol, Tobacco, Firearms, and Explosives


    Sworn to before me, and subscribed in my presence on this _2ND_ day of May, 2022,
at _2:05_ a.m./p.m), in Fort Worth, Texas.

Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE

Criminal Complaint - Page 44